UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

F.M., on behalf of B.M., an infant,

                    Plaintiff,              08-CV-4430 (CPS)

    - against -                             MEMORANDUM
                                            OPINION AND
Michael Astrue, Commissioner of            ORDER
Social Security,

                    Defendant.

----------------------------------X
SIFTON, Senior Judge.


        Plaintiff F.M., on behalf of B.M., an infant, commenced this

action against defendant Commissioner of Social Security on

October 31, 2008, seeking review of defendant's decision denying

a claim for Supplemental Security Income disability benefits

under Title VI of the Social Security Act. Plaintiff claimed that

B.M. was disabled due to deafness in one ear and recurrent

temporary deafness in the other ear, asthma, severe receptive and

expressive language delays, borderline intellectual functioning,

and a language disorder not otherwise specified. Now before the

Court is the defendant's motion for remand for further

administrative proceedings and plaintiff's cross-motion for

judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure and 42 U.S.C. § 405(g). For the reasons

stated below, plaintiff's motion is granted, and defendant's

motion is denied.

**BACKGROUND**

The following facts are drawn from the complaint, the transcript of the record of proceedings before the Commissioner and the parties' submissions in connection with this motion.

B.M. was born on September 5, 1997 and is presently 11 years old. Transcript of administrative record at 209, 491 ("Tr."). Spanish is his first language. Tr. 704-5. B.M. suffers from unilateral deafness secondary to congenital left ear atresia.[1] Tr. 462, 310. B.M.'s left external ear is deformed with a small canal. Tr. 301. B.M. has suffered from recurrent otitis media[2] in his right ear that has resulted in temporary hearing loss in that ear and operations for myringotomy[3] and insertion of tympanostomy tubes.[4] Tr. 184, 309-310. Due to his hearing impairment, B.M. wears a frequency-modulated ("FM") unit (hearing assistive device) in school. Tr. 478, 510.

The New York City Department of Education has identified B.M. as a student with a disability and has provided him with special education services since preschool. Throughout the disability period, B.M. has been placed in a collaborative team

---

[1]Atresia is the absence of a normal opening in the ear canal. *See* Stedman's Medical Dictionary 176 (27th ed. 2000).

[2]Otitis media is "inflammation of the middle ear, or tympanum." *Id.* at 1287.

[3]Myringotomy is "[i]ncision of the tympanic membrane." *Id.* at 1177.

[4]A tympanostomy is an "operation to make an opening in the tympanic membrane." *Id.* at 1900.

teaching class with one special education teacher and one general education teacher, and has received speech and language therapy and hearing education services. B.M.'s teachers have consistently described him as suffering numerous difficulties in carrying out basic classroom tasks such as understanding instructions and finishing assignments, although his behavior is good and he relates well with children and adults.

In the following sections, I first identify the criteria by which childhood disability is assessed by the Social Security Administration. I then describe the evaluations, reports, and testimony relevant to the determination of B.M.'s disability in this case.

## A. SSI Framework for Determination of Childhood Disability

Since 1974, disabled children under the age of eighteen from low-income families have been entitled to receive cash benefits known as SSI under Title XVI of the Social Security Act. In order to qualify for SSI: (1) the child's income and assets (including those imputed from the child's parents) must fall below a specified amount and (2) the child must be "disabled," that is, the child must have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than twelve months." 42 U.S.C. § 1382(a)(3), (c)(i).

The SSA regulations set forth a three-step "sequential evaluation process" for determining whether a child is disabled. 20 C.F.R. § 416.924. The first step inquires whether the child is engaged in "substantial gainful activity." If yes, the child is not disabled. 20 C.F.R. § 416.924(a). If no, the evaluation continues to the second step which inquires whether the child has any "severe" impairment, defined as more than a "slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). If the child does not have a severe impairment, he is not disabled. If the child does have a severe impairment, the third step in the sequential analysis requires a determination of whether the child has an impairment or combination of impairments that "meet, medically equal, or functionally equal" the listed impairments located in Appendix 1 to Part 404, Subpart P of 20 C.F.R. 20 C.F.R. § 416.924(d). If yes, the child is disabled; if no, the child is ineligible for SSI benefits. *Id*.

At issue in this case are limitations that are alleged to be "functionally equal" to a listed impairment. In order to determine a plaintiff's functional equivalence, the Commissioner looks at six areas, known as 'domains,' of "[b]road areas of development or functioning." 20 C.F.R. § 416.926a(b)(1). These domains are: (i) acquiring and using information; (ii) attending

and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being. *Id*. For each domain, the Commissioner rates the degree of limitation, if any, as "less than marked," "marked," or "extreme." 20 C.F.R. §§ 416.926a(d)& (e). A child is deemed to be disabled if he has an "extreme" limitation in one domain, or "marked" limitations in two or more domains. 20 C.F.R. §§ 416.926a(d).

A child has a "marked" limitation in a domain when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). The Commissioner finds a "marked" limitation when the child has a valid score that is two standard deviations or more below the mean (but less than three standard deviations) on a comprehensive standardized test designed to measure ability or functioning in that domain, and the child's day-to-day functioning in domain-related activities is consistent with that score. *Id*. A child has an "extreme" limitation in a domain when the impairment interferes "very seriously" with the ability to independently initiate, sustain, or complete activities; a standardized test showing three standard deviations below the norm signifies an "extreme" limitation. 20 C.F.R. § 416.926a(e)(3).

"For a child to have a marked or extreme limitation in a

particular domain, not all activities or functions encompassed by the domain need be impaired. For instance, a twelve-year old child could have a marked or extreme limitation in the domain of acquiring and using information if he had a serious learning disability which had prevented him from learning to read and write even though he was of normal intelligence and had good verbal communication skills." *McClain v. Barnhart*, 299 F. Supp. 2d 309, 315 (S.D.N.Y. 2004) (citing *Quinones v. Chater*, 117 F.3d 29, 31-32, 36 (2d Cir. 1997)); *see also* § 416.92a(e)(2)(i). "Alternatively, when a child suffers from multiple impairments within a single domain, each of which, when considered separately, imposes a less-than-marked limitation, the combined result nonetheless may be marked or extreme." *Id.* (citing *Encarnacion v. Barnhart*, 191 F. Supp.2d 463, 474 (S.D.N.Y. 2002)).

An Administrative Law Judge ("ALJ") may not rely on test scores alone when deciding whether a child is disabled. 20 C.F.R. § 416.924a(a)(1)(ii). Rather, she must consider test scores together with other information obtained about the child's functioning, including evidence of classroom performance and the observations of school personnel and others. 20 C.F.R. § 416.926a(e)(4). An ALJ may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairment(s). 20 C.F.R. § 416.927(f)(2)(iii). The medical

conclusion of non-examining sources may constitute substantial evidence in support of a denial of benefits. *See Diaz v. Commissioner of Social Security*, 59 F.3 307, 313 n.5 (2d Cir. 1995).

## B. Evaluations, Reports and Testimony

*1. Consultive Evaluations*

Between June and September of 2005, B.M. underwent four consultative examinations at the request of the Social Security Administration.

On June 13, 2005, Victor Lamberto, M.D. conducted a pediatric examination of B.M. that revealed significant hearing loss due to the absence of the ear canal in the left ear and abnormalities of the right ear with recurrent infections. Tr. 302.[5] On July 15, 2005, Joseph Bumatay, M.D. conducted an ear, nose, and throat evaluation of B.M. and concluded that he had normal hearing in his right ear, but "total deafness" in his left ear. Tr. 310.

In August, 2005, psychologist Arlene Rupp-Goolnick, Ph.D. conducted a child intelligence evaluation and diagnosed B.M. with a learning disorder not otherwise specified and borderline intellectual functioning. Tr. 316. During the evaluation, Dr.

---

[5]Dr. Lamberto additionally opined that B.M. had "significant delayed development, educational difficulties along with communication difficulties, due to the hearing problems." *Id.*

Rupp-Goolnick observed that B.M.'s motor behavior was restless, that he worked exceedingly slowly, and that his attention and concentration fluctuated. Tr. 315. He had expressive and receptive language difficulties and required the repetition of instructions because of difficulty in recall and in understanding. *Id*. Dr. Rupp-Goolnick concluded that B.M. could not attend to, follow or understand age-appropriate directions or complete age-appropriate tasks, and noted that he did not ask questions or request assistance in an age-appropriate manner, although he was able to adequately maintain appropriate social behavior (such as being cooperative and friendly). *Id*. at 315-16. Dr. Rupp-Goolnick administered the Test of Nonverbal Intelligence ("TONI") and determined that B.M.'s IQ was 75, noting that the TONI tends to over-inflate IQ at the lower end of the scale. Tr. 315. Dr. Rupp-Goolnick concluded that the results of her evaluation appeared to be "consistent with cognitive problems, and this may significantly interfere with B.M.'s ability to function on a daily basis." Tr. 316.

In September, 2005, New York State licensed speech-language pathologist Mindy Singer conducted a speech and language evaluation of B.M. and diagnosed him with severe receptive and expressive language delays.[6] Tr. 320. Ms. Singer observed that

---

[6]As a licensed speech-language pathologist, Ms. Singer is considered an "acceptable medical source" for purposes of establishing speech or language impairments under the Commissioner's regulations. 20 C.F.R. § 416.913(a)(5).

B.M. had a variable attention span, did not spontaneously engage in conversation, had delayed grammatical and syntax development, had difficulty interpreting spoken directions, had difficulty understanding the relationships between related words, and difficulty recalling sentences and formulating sentences. Tr. 318-19. His eye contact was poor and he did not follow conversational shifts. Tr. 320. However, his intelligibility and articulation were good. *Id*. Ms. Singer administered the Clinical Evaluation of Language Fundamentals, Fourth Edition("CELF-4") to assess expressive and receptive language skills. Tr. 318-19. Test results showed that B.M. was functioning two standard deviations below the mean in language, which Ms. Singer noted indicated severe receptive and expressive language delays. Tr. 319.

*2. State Agency Disability Determination*

In October, 2005, State agency medical consultants Ricarda Baum, M.D. and M. Lieberman concluded that B.M. had an impairment or combination of impairments that was severe, but did not entitle him to disability benefits. Tr. 322-23. The consultants concluded that B.M. had a "marked" limitation in acquiring and using information, less than marked limitations in attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and health and physical well-being, and no limitation in caring for himself. Tr. 324-25.

*3. Educational Evaluations*

As noted above, has received special education services since preschool as a student with a disability. Tr. 202, 214. Since September, 2005, B.M. has been placed in a collaborative teaching ("CTT") class with two teachers and has received speech and language therapy. Tr. 496, 508, 531, 677. B.M.'s school considered holding him back in the third grade, although ultimately the Committee on Special Education ("CSE") promoted him in June, 2006, with modified criteria and testing accommodations, including a requirement that B.M. remain in a CTT class and continue to receive speech and language therapy and hearing education services in the fourth grade. Tr. 524. In June, 2007, the CSE recommended that B.M. remain in a CTT class for the fifth grade and continue receiving speech and language therapy. Tr. 531, 543. B.M. also received testing accommodations, including extended time and re-reading directions. Tr. 543.

In September, 2007, school psychologist Renee Spira conducted a psychoeducational evaluation of B.M. Tr. 546. On the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC"), B.M. obtained an IQ score of 82, indicating low average cognitive ability. Tr. 546. He performed below average on the verbal comprehension and perceptual reasoning index, scoring in the 19th and 18th percentiles, respectively. *Id.* He performed within the average range in the working memory index, scoring in

the 34th percentile. B.M.'s score on the processing speed index,
which measures how fast one can process information, was at the
'borderline range' in the 7th percentile. *Id*. B.M. also completed
a the Wechsler Individual Achievement Test, Second Edition
("WIAT"), measuring academic achievement, which found that he was
in the 23rd percentile overall.[7] Tr. 547. In the listening
comprehension subtest, B.M. performed on a first-grade level,
which was four years below his actual grade level. Tr. 548. Ms.
Spira noted that he had a "very weak" expressive vocabulary. *Id*.

*4. Teacher Questionnaires*

     In October, 2005, B.M.'s special education teacher reported
that he had problems of a slight to obvious nature in all areas
of acquiring and using information,[8] Tr. 158, and problems of a
slight to obvious nature in some areas of attending and
completing tasks.[9] Tr. 159. In March, 2007, B.M.'s fourth grade

_____

     [7]B.M. scored in the 23rd percentile on the reading comprehension test, in
the 34th percentile on the math test, in the 30th percentile in the written
language test, and in the 25th percentile in the oral language test. Tr. 547.

     [8]The teacher indicated that B.M. had an obvious problem in the following
areas: comprehending oral instructions, reading and comprehending written
material, understanding and participating in class discussions, expressing
ideas in written form, learning new material, and applying problem-solving
skills in class discussions. Tr. 158. B.M. had a slight problem in the
following areas: understanding school and content vocabulary, comprehending
and doing math problems, providing organized oral explanations and adequate
descriptions, and recalling and applying previously learned material. *Id*.

     [9]The teacher indicated that B.M. had an obvious problem in the following
areas: refocusing to task when necessary, carrying out multi-step
instructions, and completing work accurately without making mistakes. B.M. had
a slight problem in the following areas: focusing long enough to finish
assigned activity or task, organizing school materials, completing

teacher reported that he was working on a third-grade level in many subjects and that he expressed himself well when writing but not when speaking. Tr. 525. She described him as cooperative, social and respectful. Tr. 525-26.

The record contains four Childhood Functional Questionnaires ("CFQs") completed by B.M.'s teachers in June of 2006 and June of 2007. All four teachers reported that B.M. had a marked limitation in acquiring and using information. Tr. 550, 562-63, 575-76, 587-88. Three teachers reported that B.M. had a marked limitation in attending and completing tasks, Tr. 551-52, 563-64, 588-89, while another teacher characterized his limitations as less than marked. Tr. 576-77. Three teachers noted that he has significant difficulties with communication. Tr. 572, 585, 597. However, all four indicated that B.M. has no limitation in interacting with and relating to others, Tr. 552, 565, 578, 590.

*5. Individualized Education Reports*

The record contains four Individualized Education Program ("IEP") reports from 2005, 2006, and 2007. The June, 2005 report stated that B.M. had demonstrated improvement in language skills and writing and described him as well behaved and able to relate well with other children. Tr. 498-99. The June, 2006 report stated that B.M. had again improved in language and reading

---

class/homework assignments, and working at a reasonable pace.

skills, and described him as a sweet child who related well with children and adults. Tr. at 512-13. The June, 2007 report indicated that B.M. needed support to help him pay attention and focus, that it was challenging for him to communicate, that he had difficulty processing information, and that he would require testing accommodations. Tr. 533-34, 543. An October, 2007 report stated that B.M. was of low average intelligence, although speech and language deficits may have negatively impacted his performance on the intelligence test. Tr. 669.

*6. Testimony of F.M.*

At the hearing on December 7, 2007, F.M. testified that B.M. was easily distracted and did not focus, and that listening could make him tired or give him a headache. Tr. 709. She further stated that B.M. had difficulties speaking at the appropriate volume, paying attention, and understanding words, even after repetition, especially in English.[10] Tr. 704-709. She indicated that he reacted strangely to sounds, becoming afraid at loud noises, and would sometimes scream when family members were laughing. Tr. 707.

*7. Testimony of Dr. Allen Rothenberg*

At the hearing, Dr. Allen Rothenberg testified that,

---

[10]B.M.'s first language is Spanish.

although B.M. suffers from hearing problems, attention problems, cognitive difficulty, and a speech and language delay, these severe impairments did not meet, medically equal, or functionally equal the SSI Listings, which requires a finding of "marked" limitation in at least two domains. Tr. 711-12. Dr. Rothenberg stated that B.M. had a marked impairment in the domain of attending and completing tasks, and less than marked impairments in the domains of acquiring and using information and interacting and relating with others. Tr. 712.

With regard to the first domain, Dr. Rothenberg noted that, while academic functioning was below average, it was no worse than one grade below B.M.'s age grade, which was not markedly limited. *Id.* He further noted that B.M.'s reading, writing, and math skills were in the 23rd, 30th, and 34th percentile, respectively. Tr. 713. Dr. Rothenberg testified that "marked" difficulties would be consistent with performance in the 5th percentile or below. Tr. 714. He reconciled the teachers' reports of marked difficulties by suggesting that the teachers' understanding of what counted as a "marked" limitation was likely different than that of the Social Security regulations. Tr. 717-18, 731. He opined that the teacher comments that B.M. needed redirection and had problems focusing was related to the domain of attending and completing tasks, rather than the domain of acquiring and using information. Tr. 718.

## C. Procedural History

On May 18, 2005, plaintiff filed an application for SSI benefits on B.M.'s behalf, alleging disability since January 1, 2005, due to auditory, muscle and neurological disorders, hearing loss, and asthma.[11] The application was denied on November 16, 2005, and plaintiff requested an ALJ hearing on November 30, 2005. On December 5, 2007 a hearing was held before ALJ Manuel Cofresi. Plaintiff appeared with counsel at the hearing and gave testimony. Allan M. Rothenberg, M.D. testified at the hearing as a medical expert. By decision dated January 25, 2008, the ALJ denied benefits, finding that although B.M. had congenital left ear deafness, poor hearing in his right ear, speech delays, and attention deficits, these impairments, either alone or in combination, did not meet, medically equal, or functionally equal any impairment listed at part 404, Subpart P, Appendix 1. 20 C.F.r. § 416.926a(a). Tr. 19-27. The ALJ found that B.M. had a marked limitation in the domain of attending and completing tasks, a less than marked limitation in the domains of acquiring and using information, interacting and relating with others, and health and physical well-being, and no limitation in the domains of moving about, manipulating objects, and caring for himself.

---

[11]Plaintiff had filed a previous application on May 17, 2002, which was denied on September 17, 2002, with no appeal taken.

On February 8, 2008, plaintiff, through counsel, requested review of the ALJ decision by the Appeals Council. By decision dated August 29, 2008, the Appeals Council denied review, making the ALJ decision the final statement of the Commissioner's position. On October 31, 2008, plaintiff filed a complaint in this Court seeking review of the Commissioner's decision. On April 20, 2009, the Commissioner filed a motion seeking remand of plaintiff's case to the Commissioner for further administrative proceedings. Plaintiff filed a cross-motion seeking judgment on the pleadings, or, in the alternative, seeking remand with specific instructions to the ALJ to consider evidence in light of certain statutes.

## DISCUSSION

The Commissioner concedes that the ALJ failed to properly follow the law in making his determination that B.M. was not disabled. The question remaining is whether the case should be remanded for further determinations in accordance with the law, or whether the record contains persuasive proof that B.M. is disabled under the Commissioner's regulations.

## I. Standard for Remand

Pursuant to the fourth sentence of 42 U.S.C. § 405(g),[12]

---

[12]Which is made applicable to SSI cases by 42 u.S.C. § 1383(c)(3).

this Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991); *see also Shalala v. Shaefer*, 509 U.S. 292, 297 (1993). A court may remand a case when the Commissioner has failed (i) to provide a full and fair hearing, (ii) to make explicit findings, or (iii) to have correctly applied the law and regulations. *See Melkonyan*, 501 U.S. at 101.[13] However remand is not necessary where it would be futile, as when there is no basis in fact to support a conclusion that a claimant is not disabled. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (court need not remand where the "record provides persuasive proof of disability and remand for further proceedings would serve no purpose."); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."); *c.f. Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (remand in ERISA case not required where it would be a "useless formality").

---

[13]With regard to legal errors, "'[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.'" *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

In such cases, the Court should order remand solely for the calculation of benefits rather than for a further hearing. *See Parker*, 626 F.2d at 235.

If a court cannot say with certainty what weight should be assigned to evidence that was not properly considered by the ALJ, or whether further clarification of the record with the correct legal standards in mind might alter the weighing of the evidence, the case must be remanded for further consideration of the fact. *See Schaal*, 134 F.3d at 504. In such cases, "[i]t is for the SSA, and not this court, to weigh the conflicting evidence in the record." *Id*.

## II. Analysis

Plaintiff argues that the record conclusively demonstrates that B.M. possesses marked limitations in three of the six domains: acquiring and using information, attending and completing tasks, and interacting and relating with others. The Commissioner acknowledges that the ALJ wrongly failed to consider B.M.'s scores on the CELF-4 test and the opinions of two state agency medical consultants, both of which pertain to the domain of acquiring and using information, and argues that the case should be remanded for further consideration of these facts.[14]

---

[14]The Commissioner states that, in evaluating whether B.M.'s impairments were functionally equivalent to a listed impairment, the ALJ did not discuss or evaluate the results of B.M.'s September 1, 2005 evaluation by Mindy

The following sections consider the ALJ's opinion and the record evidence with respect to the domains in which plaintiff contends that B.M. suffers a "marked" limitation.

## A. Acquiring and Using Information

Social Security regulations state that, with respect to this domain, a child must "be able to use language to think about the world and to understand others and express [himself]; e.g., to follow directions, ask for information, or explain something." 20 C.F.R. 416.926a(g)(1)(ii). A school-age child (between ages 6 and 12) without an impairment should be able to learn academic subjects and demonstrate learning, as well as navigate daily living situations,[15] and "should be able to use increasingly complex language (vocabulary and grammar) to share information

_____

Singer, a speech-language pathologist, which showed receptive and expressive language delays of more than two standard deviations below the mean, which was strong evidence that B.M. suffered a marked limitation in that area. *See* Tr. 317-21. Nor did the ALJ consider the opinions of Dr. Baum and Dr. Lieberman, State agency medical consultants who reviewed the administrative record in October of 2005, and concluded, based upon the test scores contained in Ms. Singer's report, that B.M. possessed a marked limitation in the domain of acquiring and using information. *See* Tr. 324. The Commissioner acknowledges that failure to apply the applicable legal standards, which require consideration of such evidence, requires the remand of this case to the Commissioner for further proceedings to determine whether B.M. is entitled to benefits.

[15]The text of the regulation pertaining to these qualifications states: "School-age children (age 6 to attainment of age 12). When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change)." 20 C.F.R. 416.926a(g)(2)(iv).

and ideas with individuals or groups, by asking questions and expressing [his] own ideas, and by understanding and responding to the opinions of others." 20 C.F.R. 416.926a(g)(2)(iv). The regulations set forth some examples of limited functioning in this domain, with the caveat that some of these examples may not constitute limitations for younger children. Examples pertinent to this case are: "you have difficulty recalling important things you learned in school yesterday;" and "you talk only in short, simple sentences and have difficulty explaining what you mean." 20 C.F.R. 416.926a(g)(3).[16] "[I]ndications in school records that a mental or physical impairment(s) may be interfering with a child's ability to acquire and use information include, but are not limited to" special education services (e.g. "remedial or compensatory teaching methods for academic subjects"), related services (e.g. speech/language therapy), and other accommodations (e.g. front-row seating in the classroom, more time to take tests, and having tests read to the student). SSR 09-3p, Title XVI: Determining Childhood Disability - The Functional Equivalence Domain of "Acquiring and Using Information," 74 Fed.

---

[16]A recent Social Security Ruling states, "learning and thinking also require the ability to communicate, so an impairment(s) affecting communication may cause a limitation that we evaluate in the domain of 'Acquiring and using information' in addition to the domain of 'Interacting and relating with others.'" SSR 09-5p; Title XVI: Determining Childhood Disability - The Functional Equivalence Domain of "Interacting and Relating With Others," 74 Fed. Reg. 7515, 7517 (Feb. 17, 2009).

Reg. 7511, 7513 (Feb 17, 2009).[17]

The record contains persuasive proof that B.M. has a marked limitation in the domain of acquiring and using information. *See Parker v. Harris*, 626 F.2d at 235. B.M.'s September, 2005 speech and language evaluation produced CELF-4 standardized test scores more than two standard deviations below the mean in core language, receptive language, and expressive language, and produced a diagnosis of "severe receptive and expressive language delays." Tr. 319. Given the vital importance of language abilities to the domain of acquiring and using information,[18] the CELF-4 is properly considered a "comprehensive standardized test designed to measure ability or functioning" in the domain. *See* 20 C.F.R. § 416.926a(e)(2). Because B.M.'s "day-to-day functioning in domain-related activities is consistent with" his score of two standard deviations below the mean, the regulations direct a finding that B.M. has a marked limitation. *See id*.[19]

In 2005, Dr. Rupp-Goolnick concluded that B.M. could not

---

[17]Social Security Rulings are "final opinions and orders and statements of policy and interpretations" adopted by the SSA and are "binding on all components of the [SSA]." 20 C.F.R. § 402.35(b)(1). These rulings are "entitled to deference except when they are plainly erroneous or inconsistent with the [Social Security] Act." *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995).

[18]The Commissioner's regulations provide that appropriate functioning in the domain of acquiring and using information involves, *inter alia*, "be[ing] able to use language to think about the world and to understand others and express [one]self; e.g., to follow directions, ask for information, or explain something." 20 C.F.R. § 416.926a(g)(1)(ii).

[19]The ALJ did not discuss these test results in its opinion.

understand age-appropriate directions, could not learn in accordance with cognitive functioning, and did not ask questions in an age-appropriate manner. Tr. 315-16. In 2007, when B.M. was a fifth-grade student, he scored on a first-grade level in listening comprehension. Tr. 547. School psychologist Renee Spira reported that B.M. had a "very weak" expressive vocabulary and that his "speech and language difficulties negatively affected his performance in many areas." Tr. 548. The four teachers who completed functionality questionnaires reported that B.M. had a marked limitation in the domain of acquiring and using information. B.M.'s speech teacher reported that he required "a lot of time" to process information, that instructions had to be repeated several times, and that he had difficulty retaining new material. Tr. 587. B.M.'s third-grade teacher reported that he needed constant repetition to learn, and had problems comprehending instructions, learning new material, and solving problems. Tr. 158. B.M.'s fourth-grade teacher stated that he required constant repetition to learn new material and one-on-one review to recall previously learned material. Tr. 562. A second fourth-grade teacher reported that B.M. had difficulty following instructions due to his hearing loss, was slow to answer questions, and trouble expressing what he wanted to say. Tr. 575-76. These observations demonstrate that B.M.'s day-to-day functioning in domain-related activities is consistent with his

poor performance on the CELF-4 test. Furthermore, these observations demonstrate conclusively that B.M. suffers a marked limitation in the ability to "use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others," all of which are skills deemed by the regulations to be central to functioning normally in the domain of acquiring and using information. 20 C.F.R. 416.926a(g)(2)(iv).

Further, I note B.M. has received special education services in the form of CTT and multisensory instruction, related services in the form of language and speech therapy and hearing education classes, and accommodations such as preferential seating in the classroom, testing accommodations, and modified promotion criteria. Pursuant to Social Security Administration's ruling 09-3p, these facts are indications that B.M.'s impairments are interfering with his ability to acquire and use information. *See* SSR 09-3p, 74 Fed. Reg. at 7513.

To support its argument that the record contains evidence that B.M. does not suffer a marked limitation in this domain, the Commissioner relies on the test results from the Wechsler Intelligence Scale for Children ("WISC") and Wechsler Individual Achievement Test ("WIAT"), both administered to B.M. in

September, 2007.[20] B.M. scored in the 12th percentile on the WISC, which measures overall cognitive abilities (such as perceptual reasoning and working memory), and in the 23rd percentile on the WIAT, which assesses academic achievement (testing skills in math, reading comprehension, written language, and oral language). The Commissioner argues that B.M.'s percentile rankings are above the range associated with "marked" limitations, which Dr. Rothenberg identified as the 5th percentile, which is the threshold for two standard deviations below the mean.[21]

The Commissioner's argument fails for several reasons. First, the test scores relied upon by the ALJ (showing educational capacity in the low-average percentiles) are in conflict with other information in the record concerning B.M.'s functioning, including evidence of classroom performance and the observations of school personnel and others, and therefore are insufficient to support a finding that B.M. is not disabled. *See* 20 C.F.R. § 416.924a(a)(1)(ii). The evidence in the record from

--------

[20]The ALJ found that B.M. had a less than marked limitation in this domain, based on the opinion of the medical expert, whose testimony indicated to the ALJ that "B.M.'s academic progress is not so delayed that it results in limitations that are marked in this area of functioning." Tr. 23. At oral argument on this motion, attorney for the Commissioner similarly relied on B.M.'s academic scores in arguing that B.M. is not disabled.

[21]Neither Dr. Rothenberg nor the Commissioner offered a source for his assertion that marked differences would occur below the 5th percentile. Dr. Rothenberg appears to refer to the fact that, in a data set with a normal distribution, a score in the 5th percentile is two standard deviations below the mean. *See* http://www.stat.wmich.edu/s160/book/node40.html.

other sources indicates that B.M. suffers a marked limitation in his ability to function in the classroom, as noted by numerous professionals who have evaluated him.[22]

Second, B.M.'s marked disability in one area of acquiring and using information (using complex language to share information and ideas) is not 'cancelled out' by the fact that he has achieved low-average scores in academics. *See McClain*, 299 F.Supp.2d at 315 ("For a child to have a marked or extreme limitation in a particular domain, not all activities or functions encompassed by the domain need be impaired."). The cognitive abilities tested by the WISC pertain to apprehension of information, and do not test the child's ability to engage with others in the learning process. The fact that B.M. does not suffer marked limitations with respect to perceptual reasoning and working memory is insufficient to support a finding that his limitations are less than marked in the domain of acquiring and using information.

The Commissioner points to notations in the IEP reports that B.M. made improvements in language and reading skills. However,

---

[22]In support of its argument that the test scores indicate that B.M. does not suffer a marked limitation, the Commissioner refers to an observation by B.M.'s special education teacher in October, 2005 that she could understand almost all of B.M.'s conversation, when the topic of conversation was known, and one-half to two-thirds when the topic of the conversation was unknown. Tr. 160. This observation pertains to the domain of interacting with and relating to others, not the domain of acquiring and using information. The Commissioner further refers to a report by the same teacher that found obvious limitations in several areas of acquiring and using information, but no serious limitations. This report is discussed further below.

the Commissioner's regulations provide that "good performance in a special education setting does not mean that [a child is] functioning at the same level as other children [his] age who do not have impairments." 20 C.F.R. § 416.924a(b)(7)(iv). The record makes clear that B.M. has been the beneficiary of the devoted efforts of special education teachers and therapists, whose labors have enabled B.M. to make improvements in his skills; the fact that B.M. has improved is insufficient to support a finding that B.M.'s functional limitations are not marked.

The Commissioner relies heavily on the testimony of Dr. Rothenberg, who concluded that B.M.'s limitations were less than marked in this domain. Dr. Rothenberg's assessment is not supported by the record. Notably, Dr. Rothenberg testified that B.M. was at most one grade level behind his proper grade in academics. However, he was unaware that B.M. had been permitted to advance to new grade levels under reduced achievement criteria. Dr. Rothenberg also failed to note that a test administered in 2007 found that B.M. was functioning at four grades below his grade level in listening comprehension. Tr. 518.

Dr. Rothenberg opined that B.M.'s teachers' assessment of marked limitations were based, in part, on the fact that B.M. needed redirection and help focusing, which were properly considered in the domain of attending and completing tasks rather than the domain of acquiring and using information. Tr. 718.

However, the problems noted by B.M.'s teachers in this domain were not ones attributable to his wandering attention, but rather stemmed from his inability to process information and instructions. All four of B.M.'s teachers indicated that he had significant problems understanding what was required of him and remembering what he had learned, which they addressed in part by often repeating instructions and reviewing the materials. These observations support a finding that B.M. has difficulty acquiring and using information, separate from the issue of his difficulties in maintaining focus.

Dr. Rothenberg further testified that B.M.'s teachers' understanding of what constituted a "marked" limitation was likely different than Social Security standards. In support of this, the Commissioner argues that the finding by B.M.'s special education teacher in October, 2005 that he had no "serious" problems in any sub-domain of learning and acquiring information was inconsistent with the same teacher's June, 2006 functional questionnaire, in which she stated that B.M. suffered a "marked" limitation in this domain. *See* Tr. 158, 550. However, a child may be found to suffer a marked limitation despite the fact that no individual area within the domain is markedly limited.[23]

---

[23]*See* 20 C.F.R. § 416.926a(e)(2)i) ("day-to-day functioning may be seriously limited when [a child's] impairment(s) limits only one activity or when the interactive and cumulative effects of [a child's] impairment(s) limit several activities."). In the 2005 report, B.M.'s teacher stated that out of ten areas of review pertinent to this domain, B.M. had slight problems in four areas and obvious problems in six areas, including learning new material and

I conclude that application of the correct legal principles in this case could lead to only one conclusion: B.M. suffers marked limitations in the area of acquiring and using information.

## B. Attending and Completing Tasks

The ALJ found that, as a result of B.M.'s communication problems, B.M. suffered a high degree of distractibility and inability to complete tasks, and that he required rereading of instructions and refocusing on his work. Tr. 24. The ALJ concluded that B.M. has a marked limitation in the domain of attending and completing tasks. Tr. 23-24. Because there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. *See* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Evaluating limitations in the domain of attending and completing tasks requires consideration of how well a child is able to focus and maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities. 20 C.F.R. § 416.926a(h). A school-age child without an impairment should be able to focus

---

applying problem-solving skills in class discussions. Tr. 158. Taken together, these limitations are consistent with and supportive of a finding that B.M. suffers a marked limitation in this domain. Furthermore, the special education teacher made her 2006 evaluation after teaching B.M. for an additional nine months, during which she observed his need for "constant repetition" and his difficulties with problem solving and expressing ideas in class. Tr. 550.

his attention in a variety of situations in order to follow
directions, remember and organize school materials, and complete
classroom and homework assignments. 20 C.F.R. 416.926a(h)(2)(iv).
Some examples of limited functioning in this domain (depending on
age group) include: being easily startled, distracted, or over-
reactive to sounds, being slow to focus on or failing to complete
activities, becoming easily frustrated with tasks, or requiring
extra supervision in order to remain engaged in an activity. *See*
20 C.F.R. § 416.926a(h)(3).

B.M.'s consultive evaluations, teacher evaluations, and
education records, in addition to the hearing testimony before
the ALJ, contain evidence of significant limitations in attending
and completing tasks. Dr. Rupp-Goolnick reported that B.M. was
restless and worked exceedingly slowly with fluctuating
attention. Tr. 315. B.M.'s speech and language instructor noted
that he did not follow directions and had a variable attention
span. Tr. 318. In third grade, B.M.'s teacher noted that he had
an obvious, daily problem refocusing to task when necessary and
carrying out multi-step instructions. Tr. 159. B.M.'s fourth
grade teacher noted that he was distracted easily by children
around him and rarely stayed on task without being reminded. Tr.
563-4. His speech teacher noted that he had difficulty
concentrating without supervision and could not complete tasks on
time or keep pace with other children. Tr. 590. The 2007 IEP

report stated that B.M. was unable to focus throughout assignments and complete work. Tr. 533. F.M. testified in the ALJ hearing that B.M. reacted strangely to sounds and was afraid of loud noises, which corresponds to an example given in the regulations of limited functioning. These facts provide substantial support for the conclusion that B.M. has a marked limitation in the domain of attending and completing tasks, based on his serious difficulty staying focused, carrying through and completing activities, and keeping pace with others.[24]

## C. Disposition

The ALJ in this case had access to the full record, including the numerous evaluations by B.M.'s teachers and other officials. His determination that B.M. did not suffer marked limitation in two areas of functioning was unsupported by the record. The Commissioner's request that the case be remanded for further consideration of facts overlooked by the ALJ must be denied. To remand the case for further consideration would be futile, as the only conclusion supported by the record evidence is that B.M. suffers a marked limitation in two domains, and is therefore disabled pursuant to the Commissioner's regulations.

---

[24]Because I find that B.M. has a marked limitation in two domains, I need not consider whether he has a limitation in the third domain of interacting and relating with others; a finding of marked limitations in two domains qualifies him as disabled under the Commissioner's regulations. 20 C.F.R. §§ 416.926a(d).

*See* 20 C.F.R. §§ 416.926a(d).


## CONCLUSION

For the reasons stated herein, the motion by plaintiff for judgment on the pleadings is granted, and the motion by the Commissioner for remand for further consideration is denied. The case is remanded to the Commissioner for the calculation of benefits. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.


SO ORDERED.

Dated:    Brooklyn, New York
          July 27 , 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                          United States District Judge